| | | |
|---|---|---|
| **IN RE: ACTIQ SALES AND MARKETING** | : | **CIVIL ACTION NO.  07-4492** |
| **PRACTICES LITIGATION** | : | |
| | : | |
| **AMERICAN FEDERATION OF STATE,** | : | |
| **COUNTY AND MUNICIPAL EMPLOYEES,** | : | |
| **DISTRICT COUNCIL 47 HEALTH AND** | : | |
| **WELFARE FUND, ET AL.,** | : | **CIVIL ACTION NO.  09-431** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CEPHALON, INC.,** | : | |
| **Defendant.** | : | |

**MEMORANDUM**

Tucker, J.                                                    **March 23, 2011**

Presently before this Court is Defendant Cephalon, Inc.'s Motions for Summary

Judgment pursuant to Fed. R. Civ. P. 56 (Docs. 230, 231), Plaintiffs' Response in Opposition to

Defendant's Motions for Summary Judgment (Doc. 245), and Defendant's Replies thereto (Docs.

255, 256).  Upon consideration of the parties' motions with exhibits and declarations**,** this Court

will: (1) deny Defendant's Motions for Summary Judgment against Plaintiff  Indiana Carpenters

Welfare Fund, and (2) deny Defendant's Motions for Summary Judgment against Plaintiff

Pennsylvania Turnpike Commission.

## I.       BACKGROUND

This class action suit, filed pursuant to 28 U.S.C.§ 1332, arises from the alleged losses

sustained by Plaintiffs at issue, Pennsylvania Turnpike Commission ("PTC") and the Indiana

Carpenters Welfare Fund ("ICWF").[1]  The PTC and the ICWF (collectively, "Plaintiffs") allege

that Defendant Cephalon, Inc. engaged in unlawful marketing of Actiq, a drug approved by the

U.S. Food and Drug Administration ("FDA") for use by oncologists trained to prescribe Schedule

II opioids to treat persistent pain in cancer patients.  (Am. Compl. ¶¶ 1, 2, 3, 28.)  Specifically,

Plaintiffs allege that as third party payors for prescriptions of Actiq, they suffered monetary losses

through the payment of "excessive prescription costs for treatment of conditions not approved by

the FDA and for whom a wide array of less expensive pain management drugs were appropriate."

(Am. Compl. ¶¶ 5, 61.)  The excessive Actiq prescription costs shouldered by Plaintiffs were

allegedly caused by Defendant's marketing and sale of the drug for purposes other than those

approved by the FDA.  (Am. Compl. ¶¶ 3, 5, 33.)

Defendant, a Delaware corporation with its principal place of business in Frazer,

Pennsylvania, manufactures, sells, and markets pharmaceutical drugs.  (Am. Compl. ¶ 13.)  Actiq,

manufactured by Defendant, is a Schedule II drug containing the highly addictive substance

fentanyl, which makes it a drug with an associated risk of fatal overdose. (Am. Compl. ¶¶ 13, 25,

27.) In November 1998, the FDA granted restricted marketing approval for Actiq, limiting

Defendant's marketing to cancer patients experiencing pain, "with malignancies who had

developed a tolerance to less dangerous therapies."  Furthermore, the FDA specified that Actiq

should not be marketed for off-label uses, stating that the drug "must not be used in opioid non-

tolerant patients" and must be prescribed solely to cancer patients by oncologists and pain

[1] The original Plaintiffs included: (1) Employers Mutual Casualty Company; (2) EMCASCO Insurance Company; (3) Union Insurance Company (collectively, the "EMC Plaintiffs"); (4) Ironworkers District Council Benefit Fund of Philadelphia and Vicinity ("Ironworkers"); (5) Pennsylvania Turnpike Commission; (6) Indiana Carpenters Welfare Fund; (7) American Federation of State, County and Municipal Employees, District Council 47 Health and Welfare Fund; and (8) Philadelphia Firefighters Union Local No. 22 Health and Welfare Fund.  On June 22, 2010 and June 28, 2010 respectively, the EMC Plaintiffs and Ironworkers stipulated to dismissal of their claims in this matter.  (Docs. 227, 229.)  Defendant moved for summary judgment against Plaintiffs Pennsylvania Turnpike Commission and Indiana Carpenters Welfare Fund.  (Docs. 230, 231.)

specialists specifically trained in the use of Schedule II opioids to treat pain in cancer patients. (Am. Compl. ¶ 27.)

In 2000, Defendant generated $15 million in revenue from the sale of Actiq. The revenue realized by the Defendant increased sharply, so that by 2005, sales reached $412 million, making Actiq the second largest selling drug manufactured by Defendant. (Am. Compl. ¶ 34.) On September 6, 2006, the FDA further narrowed the scope of Actiq by placing an additional warning on its label indicating the dangerousness of the drug, and its potential for abuse, misuse or diversion. (Am. Compl. ¶ 32.) Plaintiffs contend that the explosion in Actiq sales were due to Defendant's illegal marketing scheme of targeting physicians "lacking experience in the use of Schedule II opioids and the treatment of cancer patients, and to patients without malignant cancer or a history of resistance to safer pain medication." (Am. Compl. ¶ 35.)

According to the Complaint, Defendant blatantly ignored its agreement with the FDA to limit its marketing and sales efforts to appropriately qualified oncologists and treatment of cancer patients, and instead marketed Actiq to "a wide range of doctors, including general practitioners, neurologists, and sports medicine specialists." (Am. Compl. ¶ 41.) Evidence of Defendant's alleged wrongdoings include, but are not limited to, the following: (I) Defendant ignored the normal regulatory process mandated by the FDA to allow the promotion of a drug for purposes other than its FDA-approved use; (ii) in the first six months of 2006, a mere 1% of the 187,076 prescriptions filled for Actiq at retail pharmacies were prescribed by oncologists; (iii) Defendant's SEC Form 10-Q for the period ending June 30, 2002 attributed its 92% increase in Actiq sales to a "dedicated sales force" and "ongoing changes to our marketing approach"; (iv) Defendant failed to market Actiq solely to doctors who treated cancer patients, as evidenced in a Wall Street

Journal article that reported one general practitioner's statement that Defendant's sales representative visited the physician once a month, and delivered upwards of 60 coupons for free Actiq at each visit. (Am. Compl. ¶¶ 40, 42, 44, 46.)

As further evidence of Defendant's illegal marketing practices, Plaintiffs reference government investigations against the Defendant.[2] The results of the investigation conducted by the Connecticut Attorney General's Office revealed that the Defendant used several wrongful tactics to illegally market Actiq for off-label purposes, with such tactics including, but not limited to the following: (I) the use of internal documents which instructed Defendant's sales representatives to provide physicians with coupons for free Actiq, despite the fact that such physicians indicated that they have no potential to treat cancer patients; (ii) instructing sales representatives to market Actiq to neurologists as a solution for migraine headaches; (iii) promoting the use of Actiq in physicians treating non-cancer patients by funding and controlling Continuing Medical Education seminars for physicians, and paying speakers to present topics concerning off-label uses of the drug; and (iv) using materially misleading, self-funded studies to promote off-label uses of the drug. (Am. Compl. ¶ 65.) In addition, in 2007 Defendant pled guilty and paid $425 million in settlement as a result of an investigation conducted by the U.S. Attorney's Office in Philadelphia, Pennsylvania concerning Defendant's sales and promotional practices for Actiq and two other drugs.[3] (Am. Compl. ¶ 62.)

---

[2] According to the Complaint, Government investigations conducted against the Defendant concerning its practice with respect to Actiq included: (I) the investigation of the Connecticut Attorney General's Office relating to the death of a young woman; (ii) an inquiry from U.S. Representative Henry A. Waxman, Committee on Oversight and Government Reform, requesting information about Defendant's marketing and promotional activities for Actiq; and (iii) an investigation by the U.S. Attorney's Office in Philadelphia, PA.

[3] Defendant reported, in its Form 10-K for period ending December 31, 2007, that it reached an "agreement in principle" with the U.S. Attorney's Office and the Department of Justice concerning an investigation launched against it in September 2004. More specifically, Defendant agreed to pay $425 million in settlement of claims concerning its sales practices

On May 19, 2008, Plaintiffs filed their First Amended Consolidated Class Action Complaint in the United States District Court of the Eastern District of Pennsylvania against the Defendant. The remaining claims at issue are Counts III and IV of the Complaint, which set forth claims alleging Defendant's violations of state consumer protection fraud laws, and unjust enrichment received by Defendant as a result of such violations.[4]

Plaintiffs seek to recover hundreds of millions of dollars through the following requested relief: (I) damages in the amount of monies paid for Actiq; (ii) actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statues serving as the basis for their claims; (iii) pre and post judgment interest on all monetary relief; (iv) equitable relief in the form of restitution, including restitutionary disgorgement into a fluid recovery fund, to restore monies received by Defendant as a result of its alleged unlawful conduct; (v) other appropriate injunctive relief; (vi) litigation costs, including attorneys' fees; and (vii) all other relief to which Plaintiffs and members of the Class represented by Plaintiffs may be entitled at law or in equity. (Am. Compl. ¶¶ 1, 126.)

## II.     STANDARD OF REVIEW

Summary judgment is appropriate where the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 501 (3d Cir. 2008). The threshold inquiry is whether there are

---

for its drugs Actiq, Gabitril, and Provigil. Additionally, Defendant agreed to plea to a misdemeanor violation of the Federal Food, Drug and Cosmetic Act as part of the settlement agreement.

[4] On May 22, 2009, this Court granted Defendant's Motion for Judgment on the Pleadings, thus eliminating federal racketeering Counts I and II of the Complaint (Doc. 100).

"any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (noting that no triable issue exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). See also Dee v. Borough of Dunmore, 549 F.3d 225, 229 (3d Cir. 2008). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex, 477 U.S. at 327 (1986).

Once the movant has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). Under Rule 56(e), the opponent must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. See Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007). If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249; Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light most favorable to the non-movant. See Matsushita, 475 U.S. at 587; Horsehead Indus., Inc. v. Paramount Commc'ns, Inc., 258 F.3d 132, 140 (3d Cir. 2001). The court must award summary judgment on all properly supported issues submitted by the moving party unless the non-movant shows, through affidavits or admissible evidence, that an issue of material fact remains. See, e.g., Love v. Rancocas Hosp.,

270 F. Supp. 2d 576, 579 (D.N.J. 2003); <u>Koch Materials Co. v. Shore Slurry Seal, Inc.</u>, 205 F. Supp. 2d 324, 330 (D.N.J. 2002).

## III.    DISCUSSION

### A.    Choice of Law

As a preliminary matter, the Court will address the applicable choice of law for the claims before it.  Under Pennsylvania federal choice of law rules, the Court must apply the law of the state with the greater interest in the matter at hand.  This inquiry into state interest is to be performed qualitatively, by analyzing relevant contacts.  <u>Hammersmith v. TIC Ins. Co.</u>, 480 F.3d 220, 230-31 (3d Cir. 2007).  Furthermore, the Court "must apply an individualized choice of law analysis to each plaintiff's claims."  <u>Georgine v. Amchem Prods.</u>, 86 F.3d 610, 627 (3d Cir. 1996).  Thus, the Court must determine the applicable law under which it will analyze Defendant's summary judgment motion with respect to both Plaintiff ICWF's and Plaintiff PTC's claims.  First, the Court will determine whether Plaintiff ICWF's claims shall be analyzed under Indiana or Pennsylvania consumer protection laws.

Step one in the choice of law analysis requires the court to determine whether an actual conflict exists between two state laws.  <u>Hammersmith</u>, 480 F.3d at 229.  The Indiana Deceptive Consumer Sales Act ("IDCSA"), sets forth the following relevant provisions constituting deceptive practices:

> The following acts, and the following representations as to the subject matter of a consumer transaction, made orally, in writing, or by electronic communication, by a supplier, are deceptive acts:
> (1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses or benefits it does

not have which the supplier *knows or should reasonably know* it does not have. . . .

       (7) That the supplier has a sponsorship, approval, or affiliation in such consumer transaction the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have. Ind. Code § 24-5-0.5-3(a)(1), (7) (emphases added). . . .

       (a) A supplier commits a deceptive act if the supplier gives any of the following representations, orally or in writing, or does any of the following acts:

  (1) Either:

   (A) solicits to engage in a consumer transaction without a permit or other license required by law;

   (B) solicits to engage in a consumer transaction if a permit or other license is required by law to engage in the consumer transaction and the supplier is not qualified to obtain the required permit or other license or does not intend to obtain the permit or other license; or

   (C) engages in a consumer transaction without a permit or other license required by law.

  (2) Commits a violation of IC 24-5-10. Ind. Code § 24-5-0.5-10(a).

Thus, in order for the acts at issue, namely Defendant's alleged deceptive sales and marketing without FDA approval, to constitute a deceptive act or practice under the IDCSA, such act or practice must be either: (1) one where a supplier such as Defendant *knew or should have known* that either the subject of a consumer transaction, or that the supplier's status itself, was lacking necessary approvals (emphases added), or (2) one involving a consumer transaction requiring a license or permit under the law. Ind. Code §§ 24-5-0.5-3(a)(1), (7), 24-5-0.5-10(a). This places a high burden on the plaintiff, who must either prove the Defendant's knowledge of the deficiencies in its product, transaction, or status, or show that the transaction in question was performed illegally, without the requisite license or permit.

8

By contrast, the relevant Pennsylvania consumer protection law encompasses a broader category of both acts and omissions which may constitute unfair methods of competition, or unfair or deceptive acts or practices, and does not require proof of the Defendant's knowledge. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") protects Pennsylvania residents against unfair practices through the following relevant statutory definitions:

> "Unfair methods of competition" and "unfair or deceptive acts or practices" mean any one or more of the following:
>
> (4)(ii) Causing *likelihood* of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services. 73 P.S. § 201-2(4)(ii) (emphasis added).

The UTPCPL merely requires a plaintiff to show that the Defendant caused the *likelihood* of confusion concerning the goods in question (emphasis added). The result is a lower hurdle for the plaintiff to surmount. In light of the broader consumer protections afforded by the UTPCPL, there are actual and relevant differences between the consumer protections laws of Indiana and Pennsylvania. Thus, there is an actual conflict of law present, which brings this Court to the second step in the choice of law analysis.

Step two, the final step in the choice of law analysis, requires the court to assess the relevant contacts of each state based on the underlying facts. Hammersmith, 480 F.3d at 231. For guidance, this Court agrees with the outcome of several Pennsylvania cases where, in the context of class action suits involving state consumer protection laws, the courts have determined that "under Pennsylvania choice of law principles, each class member would be subject to the consumer fraud statutes of the member's home state because 'that state would have the paramount interest in

applying its laws to protect its consumers.'" <u>Karnuth v. Rodale, Inc.</u>, No. 03-742, 2005 WL

1683605, *4 (E.D. Pa. July 18, 2005) (citing <u>Lyon v. Caterpillar, Inc.</u>, 194 F.R.D. 206, 211-18

(E.D. Pa. 2000)); <u>Lewis v. Bayer, A.G.</u>, No. 0108-2353, 2004 WL 1146692, 13 (Pa. Ct. Com. Pl.

Nov. 18, 2004) (determining that the law of the class participants' state of resident applied because

such states "have a stronger interest in applying their applicable law to the sale, prescription, and

ingestion of pharmaceuticals within its borders."); <u>see also</u> <u>Cooper v. Samsung Am., Inc.</u>, 2010

WL 1220946, *3-4 (3d Cir. 2010) (applying New Jersey choice of law rules to determine that

consumer protection statute of consumer's state of residence was appropriate).

 As applied to the facts at hand, Indiana law should apply to Plaintiff ICWF's claims.

Plaintiff ICWF's principal place of business is in Indianapolis, Indiana. (Am. Compl. ¶ 11.)

Furthermore, the basis of claims in question involved Defendant's marketing of Actiq to Indiana-

based doctors and one nurse practitioner, all of whom prescribed the drug to members and

beneficiaries of Plaintiff ICWF in the state of Indiana. (Pls.' Resp. in Opp'n. 30-38.) The only

relevant contact to Pennsylvania is the fact that it is the location of Defendant's principal place of

business. (Am. Compl. ¶ 13.)

 Given these facts, this Court finds more substantial relevant contacts in the state of Indiana

than Pennsylvania. Thus, the Court will apply the IDCSA in its review of the Defendant's

summary judgment motion as it relates to the claims of Plaintiff ICWF.

 The claims of Pennsylvania-based Plaintiff PTC are clearly governed by Pennsylvania law.

All alleged actions by Defendant involved marketing Actiq to physicians in Pennsylvania (Pls.'

Resp. in Opp'n. 47-57.), and there is no state other than Pennsylvania with an interest under the

facts at issue. Thus, due to this absence of an actual conflict of laws, the Court will apply the

Pennsylvania Unfair Trade Practices Act and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. § 201-1, et seq. to its analysis of Defendant's request for summary judgment against Plaintiff PTC.

The Court finds that there is no actual conflict between the laws concerning unjust enrichment claims, and the parties have not presented an issue concerning choice of law for these claims. It is established that there are minimal actual differences between the unjust enrichment laws in each of the 50 states.[5] Thus, the Court need not engage in a choice of law analysis for the unjust enrichment claims.[6]

## B.     Indiana Consumer Protection Claim (IDCSA)

The Indiana Deceptive Consumer Sales Act (the "IDCSA") was created to protect Indiana residents from the deceptive and unconscionable acts and practices of suppliers. Ind. Code § 24-5-0.5-1(b)(2). The IDSCA identifies several unlawful "deceptive practices." Ind. Code § 24-5-0.5-3. Under the IDCSA, any person that suffered damages as a result of the deceptive act of a supplier is afforded the right to bring a private claim against such supplier concerning the consumer transaction in question. Ind. Code § 24-5-0.5-4. The following items must be satisfied for a plaintiff to have standing to bring a claim under the IDCSA: (1) plaintiff must be a qualifying "person"; (2) plaintiff must bring claim against a qualified "supplier"; (3) plaintiff must have relied upon the incurable or uncured deceptive act in question; (4) plaintiff must suffer damages as

---

[5]  See In re Mercedes-Benz, 257 F.R.D. 46, 58 (D.N.J. 2009) (stating that "[w]hile there are minor variations in the elements of unjust enrichment under the laws of the various states, those differences are not material and do not create an actual conflict ."); Powers v. Lycoming Engines, 245 F.R.D. 226, 231 (E.D. Pa. 2007), rev'd on other grounds, 2009 U.S. App. LEXIS 6785, 2009 WL 826842 (3d Cir. 2009) (finding that "[a]lthough there are numerous permutations of the elements of the [unjust enrichment] cause of action in the various states, there are few real differences.").

[6]  Lucker Mfg. v. Home Ins. Co., 23 F.3d 808, 813 (3d Cir. 1994) (finding that where the relevant laws do not conflict, the court is not required to perform a choice of law analysis) (citing Melville v. American Home Assur. Co., 584 F.2d 1306, 1311 (3d Cir. 1978) (stating that courts should avoid dicta when there is no conflict of law)); On Air Entertainment Corp. v. National Indem. Co., 210 F.3d 146, 149 (3d Cir. 2000) (stating that where parties cannot show difference between applicable laws, there exist no actual conflict and the court shall avoid engaging in the choice of law analysis).

a result of supplier's deceptive acts; and (5) the deceptive acts alleged by plaintiff must involve a qualifying "consumer transaction".    Ind. Code § 24-5-0.5-4(a).

The issue, one of first impression before the Court, is whether a third party payor plaintiff, under the IDCSA, may assert a valid claim against a drug manufacturer defendant for excess payments made by the plaintiff for prescription drugs inappropriately prescribed to plaintiff's beneficiaries due to defendant's deceptive sales and marketing practice. The IDCSA expressly sets forth that the statute "shall be liberally construed and applied to promote its purposes and policies." Ind. Code § 24-5-0.5-1(a). Thus, the Court applies this liberal standard of statutory construction in its below analysis.

Defendant Cephalon proposes three arguments in support of its summary judgment motion against Plaintiff ICWF's IDCSA claim. First, Defendant submits that Plaintiff ICWF's claim of unfair competition or deceptive acts lacks evidence of any direct misrepresentation upon which ICWF relied, as purportedly required under the IDCSA. Secondly, Defendant argues that there is no evidence of any cognizable injury as a result of its conduct. Next, Defendant claims that Plaintiff ICWF conceded its inability to satisfy the remaining requirements to bring a claim under the IDCSA. This Court disagrees with all of Defendant's contentions for the reasons set forth below.

Defendant claims that under the IDCSA, a plaintiff is required to prove its direct reliance on a defendant's allegedly deceptive act. The relevant section of IDCSA cited by Defendant is as follows:

> "(a) person *relying* upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater." Ind. Code. § 24-5-0.5-4(a) (emphasis added)

12

The Defendant asks this Court to read the above statutory language as requiring the plaintiff to have first-party reliance in order to have standing to assert a claim under the IDCSA.  Defendant correctly points out that Plaintiff ICWF conceded that it received no direct representations from Defendant concerning the appropriate uses of Actiq. (Newman Dep. at 290:21-291:2, 293:6-14, Mar. 26, 2010). Despite this undisputed fact, Defendant fails to meet its burden as the moving party for summary judgment, as there remains an issue of law concerning whether the undisputed lack of first-party reliance by Plaintiff ICWF entitles the Defendant to judgment.  The Court finds erroneous Defendant's interpretation of the term "relying" under the IDCSA.

Indiana statutes must be construed by using the plain and ordinary meanings of terms, unless doing so would result in a construction that "is plainly repugnant to the intent of the legislature or of the context of the statute."  Ind. Code 1-1-4-1(1).  This Court agrees with Plaintiff's contention that the IDCSA does *not* require first-party reliance by the consumer, as supported by reviewing the statute in its entirety to gain understanding of its context.  First, Ind. Code § 24-5-0.5-3(a) states the following concerning acts constituting deceptive practices:

> " (a) The following acts, and the following representations as to the subject matter of a consumer transaction, made orally, in writing, or by electronic communication, by a supplier, are deceptive acts: ..."  Ind. Code § 24-5-0.5-3(a).

The IDCSA goes on to define a "supplier" as a "manufacturer, wholesaler, or retailer, *whether or not the person deals directly with the consumer*." Ind. Code § 24-5-0.5 (a)(3)(A) (emphases added).  Based on this definition of the term "supplier," it is evident that the Indiana legislature intended the law to encompass deceptive acts that cause damages not only to direct consumers, but also to third parties who would lack direct reliance on a supplier's deceptive acts.  Additionally, in construing the undefined term "relying" liberally, as required by the IDCSA itself, the Court finds

13

that the term should be understood to mean that any reasonable reliance will suffice, not only that of a first-party nature.

Moreover, if the Indiana legislature intended to mandate a requirement of first-party reliance, it would have done so expressly. The Court will not read in a requirement that the reliance required under the IDCSA must be of a first-party nature when the statute itself sets forth no such requirement. Thus, the Court rejects Defendant's argument that Plaintiff ICWF's lack of first-party reliance mandates summary judgment.[7]

Next, Defendant contends that Plaintiff ICWF suffered no cognizable injury, and thus its claim of deceptive practices must fail. Defendant's reliance on recent New Jersey decisions is misplaced, as these cases are distinguishable because they address New Jersey consumer protection law, not the IDCSA.[8] In addition, Defendant's contention that there is an "emerging national trend" of holdings that "plaintiffs failed to plead a cognizable injury because they failed to allege that prescriptions of Actiq 'were ineffective even for off-label uses' or somehow inappropriate for particular participants" is inapplicable here, as the cases cited do not deal with third party payors,

---

[7] Defendant cites persuasive authority that does not support its assertion that first-party reliance is required under the IDCSA. This Court declines to follow the dicta of In re Sears, Roebuck & Co. Tools Mktg. and Sales Practices Litig., No. 05-CV-2623, 2009 WL 3460218 (N.D. Ill. Oct. 20, 2009), which is based on distinguishable facts and addresses the issue of class certification. Defendant points to the dicta of In re Sears, where the court discusses the issue of predominance, finding that justifiable reliance and proximate cause are necessary elements for a plaintiff to win relief action under the IDCSA. Id. at *5. The court in In re Sears, however, is silent on the issue of whether such justifiable reliance must be of a first-party nature. Additionally, contrary to Defendant's assertion, in Captain & Co., Inc. v. Sternberg, 505 N.E.2d, 88, 94-98 (Ind. Ct. App. 1987), the court required that damages under the IDCSA be the proximate result of an allegedly deceptive act, but reserved its discussion of reliance for the state common law fraud claim.

[8] Defendant relies upon Central Regional Employees Benefit Fund v. Cephalon, Inc., No. 09-3418, 2009 WL 3245485 (D.N.J. 2009) and Central Regional Employees Benefit Fund v. Cephalon, Inc., No. 09-3418, 2010 WL 1257790 (D.N.J. 2010). Both these cases addressed Rule 12(b)(6) motions to dismiss, and the 2009 opinion deals with the New Jersey Consumer Fraud Act, while the 2010 opinion does not address any state consumer protection statutes. Thus, this Court declines to accept these cases as supportive of Defendant's argument that Plaintiff ICWF suffered no cognizable injury under the IDCSA. Additionally, Defendant cites to In re Schering Plough, No. 06-5774, 2010 WL 2346624 (D.N.J. 2010), which discussed injury-in-fact in the context of common law fraud, not the IDCSA.

14

nor with the IDCSA.[9]  The IDCSA requires "damages...as a result of the deceptive act."  Ind. Code

§ Id. 24-5-0.5-4(a).  The record before this Court sufficiently establishes that a genuine issue of

material fact remains concerning whether Plaintiff ICWF sustained cognizable damages caused by

Defendant's misconduct.  Plaintiff ICWF provides evidence that it potentially suffered monetary

damages in the amount of its numerous reimbursement payments for Actiq prescriptions which

were utilized for off-label purposes (Pls.' Resp. in Opp'n. 39); (Def. Mot. Summ. J. 21); (Newman

Dep. 51:2-16, 52:17-53:8, 125:10-15, 180:20-181:2, 266:14-267:10).  Thus, Defendant's summary

judgment motion fails on this argument.

Third, Defendant argues that Plaintiff ICWF conceded its inability to satisfy the remaining

requirements to bring a claim under the IDCSA for the following reasons: (1) Plaintiff ICWF is not

a "consumer" of Actiq under the IDCSA, and (2) ICWF fails to satisfy the IDCSA provision

requiring that the consumer "use" Actiq for personal, familial, charitable, agricultural, or

household purposes.  (Def. Mot. Summ. J. 16-18).  This Court finds that Plaintiff ICWF is a

consumer for purposes of the IDCSA.  Plaintiff ICWF falls squarely within the IDCSA provisions

allowing a "person" to file suit for deceptive  "consumer transactions", and the transactions in

question constitute such consumer transactions.

First, Plaintiff ICWF, is a third party payor of Actiq prescriptions purchased by its members

and beneficiaries.  The IDCSA expressly contemplates such transactions, as it sets forth that a

---

[9] The following cases cited by Defendants cannot be accurately characterized as a "national trend" concerning third party payor claims and a requirement that plaintiffs show cognizable injury, as each case is distinguishable on the facts, and in regards to the state consumer protection law in question.  S.E. Laborers Health & Welfare Fund, 655 F. Supp 2d. 1270, 1281, 1287 (S.D. Fl. 2009) deals with third party payor claims under New Jersey consumer protection law, which requires an "ascertainable loss" and no reliance, contrary to the IDCSA in the present case.  Williams v. Purdue Pharma. Co., 297 F. Supp. 2d 171, 176 (D.D.C. 2003) addresses the District of Columbia Consumer Protection Procedures Act, and involves a motion to dismiss. Lastly, Lewis v. Bayer AG, No. 002353, 2004 WL 1146692 (Pa. Com. Pl. 2004) deals solely with the issue of class certification and alleged violations of the UTPCPL. This Court declines to apply these distinguishable cases to its present summary judgment analysis as it relates to the IDCSA.

"supplier" such as Defendant is "...a manufacturer, wholesaler, or retailer, *whether or not the person [supplier] deals directly with the consumer.*" Ind. Code § 24-4-0.5-2(3)(A) (emphases added). Thus, despite the fact that Plaintiff ICWF did not directly purchase Actiq from Defendant, Plaintiff still has standing to bring a claim under the IDCSA. The provision of the IDCSA addressing standing states that "a *person* relying upon an uncured or incurable deceptive act may bring action for damages actually suffered as a consumer as a result of the deceptive act..*"* Ind. Code § 24-5-0.5-4(a). Furthermore, the statute defines a "person" as "an individual, corporation, the state of Indiana or its subdivisions or agencies, business trust, estate, trust, partnership, association, nonprofit corporation or organization, or cooperative or any other legal entity."[10] Ind. Code § 24-5-0.5-2(2).

In addressing the issue of whether ICWF is considered a "consumer" for purposes under the IDCSA, this Court declines to accept Defendant's contention that the statutory definition of Indiana's Product Liability Act consumer should apply. If the Indiana legislature, in creating and amending the IDCSA, desired that such definition be applicable, it would have expressly set forth this intention. Because the IDCSA itself is silent on the definition of the term "consumer," and fails to reference the Indiana Product Liability Act, the Court declines to read into the statute such a definition when there is none.

---

[10] The Indiana Court of Appeals has held that the consumer protections afforded under the IDCSA apply to business entities.

> [A]n entity doing business with either an "individual, corporation, the state of Indiana or its subdivisions or agencies, business trust, estate, trust, partnership, association, nonprofit corporation, or cooperative or any other legal entity" constitutes a consumer transaction.

> Liberty Publ'g v. Carter, 868 N.E.2d 1142, 45 (Ind. Ct. App. 2007), rev'd on other grounds, 887 N.E.2d 92 (Ind. 2008).

Accordingly, the Court will construe the term "consumer" in accordance with Indiana law, requiring that terms be construed "in their plain, or ordinary and usual, sense." Ind. Code § 1-1-4-1(1). As a result, this Court finds third party payor Plaintiff ICWF falls squarely within the ordinary definition of "consumer," which means "one that utilizes economic goods."[11] In this case, Plaintiff ICWF uses economic goods, namely drugs such as Actiq, to provide prescription reimbursements for treatment of its members and beneficiaries. (Newman Dep. 51:2-16, 52:17-53:8, 125:10-15). Under this ordinary definition, it matters not that Plaintiff ICWF itself did not physically consume or use the drug Actiq.

The Court also disagrees with the Defendant's position that ICWF fails to satisfy the IDCSA provision requiring that the consumer use Actiq for personal, familial, charitable, agricultural, or household purposes. In re Bextra/Celebrex Mktg. Sales Practices & Prods. Liab. Litig., 495 F. Supp. 2d 1027 (N.D. Cal. 2007) addressed an analogous situation, where plaintiffs, Indiana third party payors brought suit against pharmaceutical companies under the IDCSA for plaintiffs' reimbursement of prescriptions of Celebrex and Bextra. The In re Bextra court found that under the IDCSA, "a sale to a corporation 'for purposes that are primarily personal' qualifies as a consumer transaction within the meaning of the statute." Id. at 1036.

The Court finds that contrary to Defendant's contention, the IDCSA does not require a direct transaction between the plaintiff and the defendant involving the sale of goods primarily for personal, family, charitable, agricultural, or household purposes. To the contrary, it requires only that the plaintiff's damages arise from defendant's provision of such goods. Plainly stated, there is

---

[11] Merriam-Webster's Collegiate Dictionary (10th ed. 1993).

no mandate under the IDCSA that the plaintiff must be the consumer who purchased the goods primarily for personal purposes.

Plaintiff is a valid consumer for purposes of the IDCSA, as its use of Actiq, through its payment for prescriptions of its members and beneficiaries, fits squarely within the ordinary meaning of the term "consume". Plaintiff's payments for the drug arose from the sales of Actiq to its members and beneficiaries for the treatment of illnesses, with such transactions qualifying as consumer transactions for personal purposes under the IDCSA. Thus, the Court denies summary judgment against Plaintiff ICWF, as it is a plaintiff with standing to bring suit under the IDCSA.

**C.     Pennsylvania Consumer Protection Claim**

Pennsylvania's Unfair Trade Practices and Consumer Protection Law (the "UTPCPL") was enacted to provide a private cause of action for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal." 73 P.S. § 201-9.2(a).

In support of its summary judgment motion against Plaintiff PTC, Defendant argues that: (1) Plaintiff PTC presented no evidence of any misrepresentation upon which PTC justifiably relied; (2) there is no evidence of any cognizable injury under the UTPCPL; and (3) the PTC has conceded that it is incapable of satisfying the remaining statutory requirements to bring a claim under the UTPCPL. For the reasons set forth below, the Court will deny Defendant's motion for summary judgment concerning the UTPCPL claims asserted by Plaintiff PTC.

First, the Court will address the issue of standing. Plaintiff PTC, a third party payor, is a "person" for purposes of the UTPCPL, "who purchases or leases goods or services primarily for personal, family or household purposes." 73 Pa. Const. Stat. § 201-9.2. The term "person" is defined

by the UTPCPL as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." Id. at 201-2(2). As discussed in Am. Fed'n of State County and Mun. Employees v. Ortho-McNeil-Janssen Pharms., Inc., No. 08-cv-5904, 2010 WL 891150, *3-4 (E.D. Pa. 2010) ("AFSCME"), Pennsylvania courts have taken a longstanding position of validating third party payor claims against drug manufacturers under the UTPCPL:

> Pennsylvania courts, however, have long recognized the ability of third-party trusts and associations to assert UTPCPL claims on behalf of their constituent members based on the statute's broad definition of "person." Section 201-9.2(a) of the UTPCPL permits a private action for the recovery of damages for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money ... as a result of ... [any] act or practice declared unlawful by this act ...." The UTPCPL defines "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." In addition, the "purpose" requirement of § 201-9.2(a) focuses on whether the final consumer uses the product for personal, family or household use, not whether the third-party entity personally uses the product or merely purchases it. Id. at *3.

Furthermore, the court determined that because third party payors purchased the prescription drug in question on behalf of their members, and such drugs were purchased for personal, family and household use, plaintiff payors had the right to bring their claims under the UTPCPL. Id. at *4.

The Court finds that Balderston v. Medtronic Sofar Danek, Inc., 285 F.3d 238 (3d Cir. 2002), relied upon by Defendant, is not analogous to the facts at hand. In Balderston, the plaintiff, an orthopedic surgeon, was sued by patients for his use of screws unapproved by the FDA. Id. at 239. The plaintiff surgeon sued the manufacturer of the screws for falsely representing that the screws were approved by the FDA. However, payments for the screws were made solely by the surgeon's patients, and not by the surgeon. Id. at 241. It is in this context that the Balderston court concluded that plaintiff did not qualify as a purchaser.

It is notable that in <u>AFSCME</u>, the court rejected defendants' attempt to use <u>Balderston</u> to support their argument that third party payors did not qualify as purchasers under the UTPCPL. <u>AFSCME</u>, No. 08-cv-5904, 2010 WL 891150 **3-4. The <u>AFSCME</u> court stated:

> The distinctions between the facts in Balderston and the facts as pled before this Court are clear. Whereas in Balderston, the plaintiff could in no way be considered a purchaser or even consumer of the goods at issue, Plaintiffs here actually paid for the fentanyl patches on behalf of their members for their members' personal, family or household use. <u>Id.</u>

Based on the above reasoning, the Court finds that Plaintiff PTC qualifies as a purchaser under the UTPCPL.

Additionally, the Court rejects Defendant's attempt to use the learned intermediary doctrine to preclude Plaintiff's standing, and finds that cases cited in support of this contention relate to patients bringing personal injury claims rather than third party payors bringing suit for economic recovery under the UTPCPL.[12] To the contrary, there are decisions which support the opposite proposition, namely, that the learned intermediary doctrine shall not preclude third party payors from asserting claims under state consumer protection laws.[13] Thus, Plaintiff PTC has standing to bring the present claim under the UTPCPL.

For its argument concerning justifiable reliance, Defendant cites <u>Hunt v. U.S. Tobacco Co.</u>, 538 F.3d 217, 221 (3d Cir. 2008), which found that the Pennsylvania Supreme Court requires plaintiffs

---

[12] The Defendant relies upon distinguishable cases to support its faulty assertion that the learned intermediary doctrine should preclude claims by third party payors under the UTPCPL. <u>See Smith v. Bristol-Myers Squibb Co.</u>, No. 06-6053, 2009 WL 5216982, *5-6 (D.N.J. 2009) (finding that plaintiff, a patient allegedly injured by use of Plavix, was precluded from bringing a claim under the UTPCPL); <u>Albertson v. Wyeth, Inc.</u>, No. 2944, 2003 WL 21544488, *11-12 (Pa. Com. Pl. July 8, 2003) (stating that patient plaintiffs "have no cause of action under the UTPCPL based on the learned intermediary doctrine."); <u>Luke v. Am. Home Prods. Corp.</u>, No. 1998-c-01977, 1998 WL 1781624, *8 (holding that the learned intermediary doctrine precluded a UTPCPL personal injury claim brought by patient plaintiff).

[13] <u>See In re Bextra & Celebrex Mktg. Litig.</u>, 2007 WL 2028408, *5 (N.D. Cal. 2007) (stating that "[d]efendants' 'learned intermediary doctrine' argument fails for the same reasons discussed above. As the SAC alleges that defendants deceived the physicians, as well as the consumers and third-party payors, the fact that a patient's physician prescribed Celebrex does not break the chain of causation; to the contrary, defendants' alleged deception of the physicians, causing the physicians to prescribe Celebrex, is an integral part of the causation chain.").

to prove justifiable reliance in alleging deceptive conduct under the UTPCPL. The court in Hunt points out that Pennsylvania common law has established that it is not enough for a plaintiff to merely prove causation. A plaintiff bringing a claim under the UTPCPL must also show that it justifiably relied on the defendant's misrepresentations. Id. at 222.

The Court in this case finds that the concept of justifiable reliance discussed in Hunt is a matter for which there remains a genuine issue of material the fact based on the record. Here, Plaintiff PTC is a third party payor bringing a private claim for deceptive acts in marketing and sales activities of Defendant. The Court finds Lawn v. Enhances Serv. Billing, Inc., Civ. Action No. 10-cv-1196, 2010 WL 2773377, *5 (E.D. Pa. July 13, 2010) instructive. In Lawn, the court held that "the fact that the misrepresentation was made to a third party does not automatically negate a claim for fraud."

Moreover, the Court finds that the established Pennsylvania common law construction requiring justifiable reliance does *not* require first-party reliance, as the Defendant contends.[14] Plaintiff PTC has provided sufficient evidence such that a fact finder may find justifiable reliance. Such evidence includes, but is not limited to, exhibits detailing the Actiq prescribing activities of Pennsylvania physicians as a result of Defendant's direct marketing efforts to such physicians for off-label uses of the drug, and payments to Pennsylvania physicians for promoting off-label uses of the drug. (Pls.' Resp. in

---

[14] In Pennsylvania Employee Benefit Trust Fund v. Zeneca, Inc., 710 F. Supp. 458, 480 (D. Del. 2010), the court stated the following concerning Pennsylvania's common law finding a requirement of justifiable reliance under the UTPCPL: "In Hunt, the Third Circuit instructed that a plaintiff asserting a private cause of action under the UTPCPL must prove justifiable reliance. 538 F.3d at 221; see also Seldon v. Home Loan Servs., Inc., 647 F. Supp. 2d 451, 465-66 (E.D. Pa. 2009) (recognizing that a plaintiff asserting a cause of action under the UTPCPL must prove justifiable reliance on the unlawful conduct and not merely that the unlawful conduct occurred); Yocca v. Pittsburgh Steelers Sports, Inc., 578 Pa. 479, 854 A.2d 425, 438 (Pa. 2004) ("To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance."); Weinberg v. Sun Co., Inc., 565 Pa. 612, 777 A.2d 442, 446 (Pa. 2001) (holding that a plaintiff bringing an action under the UTPCPL must prove the common law fraud elements of reliance and causation with respect to all subsections of the UTPCPL)." It is notable that none of the above cases mention that justifiable reliance requires first-party reliance. It should also be noted that Pennsylvania Employee Benefit Trust Fund v. Zeneca, Inc. involved a motion to dismiss, with the Court basing its opinion on the complaint without the benefit of additional materials on the record, as are available in the case at hand.

Opp'n. 47-51.)  Thus, there remains a genuine issue of material fact concerning whether Plaintiff PTC's

payments on behalf of its members and beneficiaries for the prescription drug Actiq were based on the

justifiable reliance on representations made by Defendant to prescribing physicians.

Due to the above finding, the Court need not address Defendant's additional arguments

concerning Plaintiff PTC's claims under the UTPCPL, as the Court finds; (1) Plaintiff PTC has standing

to bring suit under the UTPCPL, and (2)  there remain genuine issues of material fact which preclude

summary judgment.

**D.      Unjust Enrichment Claims**

As noted above, there are minimal actual differences between the unjust enrichment laws in

each of the 50 states.  Thus, the Court will analyze Defendant's summary judgment motion concerning

these claims using the well established principles of the doctrine found in both Indiana and Pennsylvania

unjust enrichment laws.[15]  Unjust enrichment is usually employed in matters involving quasi-contractual

issues, where a plaintiff desires recovery from the defendant for a benefit received under an

unconsummated or void contract.[16]  Under Pennsylvania law, a showing of unjust enrichment requires

plaintiff to prove that it: (1) conferred a benefit on the defendant; (2) such benefit was known and was

retained or accepted by the defendant; and (3) it would be inequitable to allow the defendant to retain

such benefit.[17]

---

[15]  It is a well established principle that in the absence of a conflict of law, the court may refer to the laws of the relevant states interchangeably.  See Hammersmith v. TIG Ins. Co., 480 F.3d 220, 229 (3d Cir. 2007).  Additionally, Defendant acknowledges that "there are no ascertainable relevant differences between the unjust enrichment law of Pennsylvania and that of Indiana." (Def. Mot. Summ. J. 11 n.3).

[16]  Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 936 (3d Cir. 1999).

[17]  See Mitchell v. Moore, 729 A.2d 1200, 1203 (Pa.Super.Ct.1999); Zvonik v. Zvonik, 435 A.2d 1236, 1239 (Pa. Super. 1981) (stating that "

The Court rejects Defendant's contention that unjust enrichment is a claim which must attach to a valid, independent statutory claim.  To the contrary, the Court finds that unjust enrichment is its own cause of action, with its own required

Defendant argues that Plaintiffs' unjust enrichment claims must fail, as Plaintiffs are incapable of satisfying the core elements of such claim. The Court finds that Plaintiffs have set forth sufficient, undisputed evidence such that Defendant is not entitled to summary judgment as a matter of law concerning unjust enrichment.[18]  The record reflects that Plaintiffs, third party payors, bestowed upon Defendant a monetary benefit in the form of the payments for Actiq for the members of Plaintiffs, and that Defendant has retained this benefit.  (Pls.' Resp. in Opp'n. 65-66).  This benefit need not be the result of a direct relationship between the parties in order to fulfill such element of unjust enrichment.[19]

Contrary to Defendant's argument, a claim of unjust enrichment is not defeated if the plaintiff received value in exchange for the benefit that it conferred.  See In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 545 (D.N.J. 2004) (declining to dismiss unjust enrichment claims where third party payors attempted to recover payments for drugs for its beneficiaries, stating that "[p]laintiffs' receipt

elements.  In Steamfitters, the Third Circuit determined the following:

> "In the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched)." Id. at 936.

Defendant is incorrect in its assertion that Steamfitters decision establishes that plaintiff must have a valid statutory claim in order for its unjust enrichment claim to survive.  Steamfitters was further clarified by this District in Zafrana v. Pfizer, Inc., 724 F. Supp. 2d 545, 560 (E.D. Pa. July 20, 2010), which recognized that the decision was limited and held only that "unjust enrichment is not a substitute for failed tort claims in Pennsylvania."

[18] Defendant cites In re Yasmin and Yaz Marketing Sales Practices & Prod. Liab. Litig., 09-cv-20071, 2010 WL 3119499 (S. D. Ill. 2010) for the proposition that where a tort claim fails due to a lack of proximate cause under analogous facts, an unjust enrichment claim based on such tort claims must also fail.  Id. at *9.  Here, the Court has determined that Plaintiffs' state consumer protection law claims do not necessarily fail as a matter of law, and thus the above finding of In re Yasmin is inapplicable.

[19] Benefit Trust Life Ins. Co. v. Union Nat'l. Bank, 776 F.2d 1174, 1177 (3d Cir. 1985) (stating that "the essence of the doctrine of unjust enrichment is that there is no direct relationship between the parties."); see also Goldsmith Assocs. v. Del Frisco's of Phila., Inc., 2009 U.S. Dist. LEXIS 92193, *10-11 (E.D. Pa. 2009).

of valuable medicine for their payments does not, as [d]efendants contend, bar an unjust enrichment claim."). Id.

Additionally, there remains a question of law as to whether Defendant's conduct would make it inequitable for Defendant to continue to retain this monetary benefit from its sales of Actiq, which was allegedly obtained due to Defendant's unlawfully deceptive practices. The Court finds this case distinguishable from the Third Circuit's decision in Steamfitters, where the court's dismissal of unjust enrichment claims was premised upon the fact that plaintiff's traditional tort claims failed to establish proximate cause due to the remoteness of the injuries in relation to the defendant's wrongful conduct. Id. at 937. In Steamfitters, union health and welfare funds brought a class action suit against tobacco makers and industry organizations. The plaintiffs claimed that defendants' fraudulent misconduct caused plaintiffs' members and beneficiaries to suffer personal injuries in the form of increased smoking-related illnesses. Id. at 917-18. As a result, plaintiffs claimed that they were damaged by having to pay increased medical insurance costs to treat their patients. Id.

As the Court discussed above, there remain genuine issues of material facts surrounding Plaintiffs' claims of the Defendant's wrongdoings, which, contrary to the facts in Steamfitters, are not so far fetched that a fact finder could not find in favor of Plaintiffs. Contrary to Steamfitters, the Plaintiffs here bring consumer protection claims concerning Defendant's marketing and sale of Actiq, which was paid for directly by Plaintiffs on behalf of their beneficiaries. Thus, in this case, the alleged damages suffered by Plaintiffs are much less attenuated than the purported tort-related harms in Steamfitters, where plaintiffs' damages were premised not directly upon the sale activities of Defendants, but also influenced by the intervening cause of personal injuries of their members. Summary judgment is denied on both the Pennsylvania and Indiana unjust enrichment claims.

## IV.  CONCLUSION

Based on the evidence on the record concerning the circumstances surrounding Defendant's sales and marketing of Actiq in both Indiana and Pennsylvania, the Court finds the following: (1) Defendant is denied summary judgment concerning Plaintiff ICWF's IDCSA and unjust enrichment claims, and (2) Defendant is denied summary judgment concerning Plaintiff PTC's UTPCPL and unjust enrichment claims, as there remain genuine issues of material fact.

An appropriate Order will be entered in accordance with this memorandum opinion.

**BY THE COURT**:

**/s/ Petrese B. Tucker**

_____

**Hon. Petrese B. Tucker, U.S.D.J.**